

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00177-CR

_____

CHARLES DEAN BRYANT, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1510666R

---

Before Sudderth, C.J.; Gabriel and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

A jury convicted Appellant Charles Dean Bryant of murder and tampering with evidence. In one point, Appellant challenges the sufficiency of the evidence regarding the murder conviction.[1] We affirm.

## II. Background

On the morning of September 14, 2016, two men with the City of Grapevine's parks crew were driving to work near Grapevine Lake when they were alerted to a fire in some brush at Acorn Woods Park. After one of the men was able to put out the fire with a bucket of water from the truck, they were able to get close enough to recognize that lying in a melted blue plastic kiddie pool was a body that had been burning and was charred. Within minutes, the Grapevine Fire Department and the Grapevine Police Department arrived at the scene. Agents from the Federal Bureau of Investigation eventually arrived and took over the crime scene. The Tarrant County Medical Examiner's Office identified the charred body as Jacqueline Vandagriff (Decedent) by her fingerprints. In addition to being set on fire, Decedent had been dismembered and decapitated, and her heart had been removed.

---

[1]Appellant acknowledges in his brief that with regard to the tampering charge, his trial counsel had "admitted during final argument that Appellant, in an intoxicated state, panicked when . . . [Decedent] stopped breathing during sex and dismembered her and tried to destroy her remains by fire as charged in Count Two of the indictment."

Investigators discovered that Decedent had been seen with Appellant the night before she was found dead. Surveillance video showed them drinking together at two bars in Denton, Texas, and seemingly getting along. Surveillance video also showed Appellant and Decedent leave together, get into his vehicle, and the vehicle drive away about thirty minutes later. One individual who interacted with Decedent and Appellant at one of the bars recalled that Decedent, who was an undergraduate student at Texas Women's University (TWU), was carrying a TWU bag that night. Further investigation of Decedent's cell phone revealed that her phone had utilized a cell tower that night at about 1:30 a.m. in a coverage area of Haslet, Texas, that included Appellant's home. When the FBI searched Appellant's home, they discovered a TWU bag and a zip-tie in a trash can outside of the home. They also discovered a blue kiddie pool that matched the specific design on the pool that Decedent's remains were found in, and next to it, they found a circular barren area where it appeared another pool had recently been and which had created the dead area. The search team also discovered a knife in Appellant's room. When Appellant's vehicle was searched, investigators discovered a stun gun in the center console.

Appellant was indicted for the offenses of murder and tampering with or fabricating physical evidence. *See* Tex. Penal Code Ann. §§ 19.02(a)(1)–(2), 37.09(a). The indictment included a deadly weapon allegation. Appellant pleaded not guilty to both counts and not true to the deadly weapon allegation. Following a seven-day trial, the jury convicted Appellant of both offenses and returned a finding that Appellant

3

committed the offense of murder with a deadly weapon. The jurors assessed punishment at confinement for life in the Texas Department of Criminal Justice for murder and 20 years' confinement in the TDCJ for tampering. Appellant filed a motion for new trial, which was overruled by operation of law, and this appeal followed.

### III. Sufficiency of the Evidence

Other than a general citation of authority, Appellant's entire argument is: "[B]ecause of the lack of any direct evidence showing [Decedent] died by violent means caused by Appellant, no rational jury could convict him of the offense of murder as charged in the indictment." However, earlier in his brief, Appellant asserted that the evidence is "insufficient to prove that he had [the requisite] intent or knowledge." Therefore, we construe Appellant's brief as challenging the sufficiency of the evidence with regard to causation and intent and we will address each contention. *See* Tex. R. App. P. 38.9. For the reasons shown below, we conclude that the evidence was sufficient with regard to both causation and intent.

### A. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential

4

elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

Because our approach to review is holistic, we "must not engage in a divide and conquer strategy but must consider the cumulative force of all the evidence." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) (internal quotation marks omitted). That is, "[e]ach fact need not point directly and independently to the guilt of the

5

appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993), *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994), and *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)); *see also Temple v. State*, 390 S.W.3d 341, 361 (Tex. Crim. App. 2013).

Our standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599. We must scrutinize circumstantial evidence of intent as we do other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). But when a record supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). Also, the State need not disprove every conceivable alternative to the defendant's guilt. *Thompson v. State*, No. 02-15-00301-CR, 2017 WL 710630, at *3 (Tex. App.—Fort Worth Feb. 23, 2017, pet. ref'd) (mem. op., not designated for publication).

### B. Applicable Law

The indictment in this case charged Appellant with committing murder pursuant section 19.02(b)(1), (2) of the penal code with the use of a deadly weapon as follows:

6

[Appellant] on or about the 14th day of September 2016, in the County of Tarrant, State of Texas, did then and there intentionally, with the intent to cause serious bodily injury to [Decedent], commit an act clearly dangerous to human life, namely by, manner and means unknown to the grand jury or by homicidal violence, and thereby caused the death of [Decedent][;]

. . . On or about the 14th day of September, 2016, [Appellant] did then and there intentionally or knowingly cause the death of an individual, [Decedent], by manner and means unknown to the grand jury or by homicidal Violence[;]

. . . And it is further presented in and to said court that during the commission of the felony offense or felony offenses set out above the said [Appellant] used or exhibited a deadly weapon, to-wit: an object unknown to the grand jury, and/or a zip tie, and/or a ligature, and/or a knife, and/or a machete, that in the manner of its use or intended use was capable of causing death or serious bodily injury[.] [Original all caps.]

When an indictment and charge authorize a jury to convict on more than one theory, we uphold the guilty verdict if the evidence is sufficient on any one of the theories. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

The penal code provides that a person commits murder if he "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(1)–(2). Under the second subsection, the State is not required to prove an intent to kill but instead must prove an intent to cause serious bodily injury. *Medina v. State*, 7 S.W.3d 633, 638 n.4 (Tex. Crim. App. 1999) (op. on reh'g); *Ortiz v. State*, 651 S.W.2d 764, 767 (Tex. Crim. App. 1983).

"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a). The penal code also provides that

> [a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Id.* § 6.03(b). Intent or knowledge is a fact question to be determined by the totality of the circumstances. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003); *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998).

With respect to causation, the State must establish a "but for causal connection" between the defendant's conduct and the resulting harm. *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986); *see also Williams v. State*, 235 S.W.3d 742, 755 (Tex. Crim. App. 2007). If evidence presented at trial "leaves uncertain the means used or the precise cause of death of the deceased but creates no doubt that the deceased was killed by acts of the accused," then the State has sufficiently proved causation. *Reeves v. State*, 969 S.W.2d 471, 479 (Tex. App.—Waco 1998, pet. ref'd) (op. on reh'g).

Therefore, to convict Appellant of murder as charged in the indictment, the State was required to prove beyond a reasonable doubt that Appellant (1) intentionally

8

or knowingly caused Decedent's death by unknown means or homicidal violence, or (2) intended to cause Decedent serious bodily injury and caused her death by unknown means or homicidal violence.

### C. Analysis

#### 1. The lack of direct evidence is not dispositive.

As an initial matter, Appellant's contention that "no rational jury could [have] convict[ed] him of the offense of murder as charged in the indictment" because of a "lack of any *direct* evidence" ignores that circumstantial evidence carries the same probative force as direct evidence. [Emphasis added.] *See Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) ("Circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone may be sufficient to establish guilt."); *see also Williams v. State*, 513 S.W.3d 619, 635 (Tex. App.—Fort Worth 2016, pet. ref'd) ("[C]ircumstantial evidence is as probative as direct evidence in establishing guilt.").

#### 2. The evidence establishes that Appellant was with Decedent the night before her body was found.

The trial evidence[2] conclusively established that Appellant was with Decedent the night before her body was discovered. Several patrons and employees of two

---

[2]More than thirty people testified at trial, and over 100 exhibits were admitted into evidence.

9

Denton bars testified that they saw Appellant and Decedent together at both bars.[3] Indeed, numerous video clips taken from the surveillance cameras at or near the bars show Appellant and Decedent meeting at one bar, traveling to a second bar, then leaving together in Appellant's vehicle around 9:46 p.m. on September 13, 2016. Surveillance video showed that Appellant's vehicle did not drive away until approximately 30 minutes after Appellant and Decedent got into it. Additional surveillance video from a gas station in Denton appeared to show Decedent in Appellant's car at approximately 10:30 p.m. Thus, direct evidence placed Appellant and Decedent together on the night of September 13, 2016.

### 3. The evidence establishes that Decedent's property was at Appellant's home the night Decedent was murdered.

The trial evidence supported that Decedent's property was at Appellant's home on the night she was murdered. One FBI agent testified that Decedent's cell phone connected to or "pinged" cell towers that placed Decedent's phone in the vicinity of Appellant's home in Haslet around 1:30 a.m. on the morning of September 14, 2016. The trial evidence also supported that Decedent had a TWU bag that was found in a trash container outside of Appellant's home. This evidence made it reasonable for the jurors to conclude that Decedent's property was at Appellant's home on the night she was killed and that Appellant attempted to dispose of the bag to conceal that fact.

---

[3]One patron testified that Decedent had apparently been there to meet a date who had not shown up and that Appellant and Decedent struck up a conversation after she had been waiting.

10

**4. The evidence establishes that Decedent died by homicidal violence.**

A Tarrant County deputy medical examiner testified at trial that Decedent died by homicidal violence. The deputy medical examiner testified that Decedent did not have soot in her airways, so she concluded that Decedent was not alive at the time her body was set on fire. The deputy medical examiner also testified that Decedent had fractures of the hyoid bone, which is caused by "force applied to the upper neck."

A forensic anthropologist with the Tarrant County Medical Examiner's Office described the hyoid bone as "a U-shaped bone that is deep in the throat" and that "anchors the tongue." She testified that Decedent had a broken hyoid bone and fractured ribs—injuries that were perimortem and not attributable to decapitation or dismemberment. She testified that injuring the hyoid bone is consistent with strangulation because it requires direct pressure, often by hands or a ligature. The forensic anthropologist further testified that because Decedent's soft tissue had been burned, she could not state for certain whether Decedent's hyoid bone was fractured manually with hands or a ligature, but she did state that in her opinion the injuries were caused by strangulation.

A forensic DNA analyst with the University of North Texas Center for Human Identification testified that female DNA was found on the zip-tie found in a trash can outside of Appellant's home and that Decedent could not be excluded as the major

DNA contributor.[4]  She further testified that DNA was found on the knife blade recovered at Appellant's home and that Decedent could not be excluded as the major contributor.  And, the DNA analyst testified that DNA was found on the stun gun recovered from Appellant's car and that Decedent could not be excluded as the major contributor.  The DNA found on the zip-tie, knife, and stun gun was matched to Decedent such that it was almost statistically impossible that it had a source other than Decedent.  Appellant's counsel conceded in argument that Decedent's DNA was found on the zip-tie and stun gun.

Appellant's witness, a forensic pathologist with American Forensics, testified in agreement with the State's forensic anthropologist that Decedent died by homicidal violence:  "[The forensic anthropologist] called it homicidal violence, and I would have called it the same thing."  She also testified that a zip-tie could have caused the injuries to Decedent's hyoid bone.  The forensic anthropologist testified that injuries to Decedent's hyoid bone could have been caused by strangulation—manually with hands or with a zip-tie.  She agreed with the State's forensic anthropologist that the "vast majority" of Decedent's injuries occurred after she had already died.

---

[4]The forensic DNA analyst explained that DNA identification consists of comparing a DNA sample extracted to a known individual's DNA and then either excluding the known individual as a DNA contributor, or not excluding the known individual and providing a statistical probability supporting the conclusion based on an FBI database containing DNA profiles from thousands of individuals within the United States.

Therefore, based on the trial evidence, jurors could conclude beyond a reasonable doubt that Decedent died from homicidal violence and specifically by strangulation.

But the experts examining Decedent's remains described more than just the injuries to her hyoid bone and the results of her body being dismembered and decapitated. These witnesses described how her chest was opened and her heart removed and that multiple ribs on Decedent's body were fractured.

In addition, Decedent received an injury that resulted from blunt force trauma to her head. Appellant's counsel questioned his own expert whether this trauma might have resulted from her head making contact with an object during sex in the back of a vehicle. On cross-examination, the expert agreed that the trauma was caused by more force than would occur in such an event:

> Q. You talked about the contusion to the head, that you didn't think it would -- if someone was having sex in the back of a car and they hit their head on the side of the car, it would take more force than that; is that right?
>
> A. Right.

The State's expert opined that the blunt force trauma to Decedent's head was unlikely to have occurred after her death:

> Theoretically, as I discussed, the blunt injuries of the head that have the bleeding associated with them are very much less likely to be post-mortem or after death, because there shouldn't be that level of bleeding into the soft tissue, but I just put them together in that one category.

Appellant's expert agreed:

Q. And, also, that the hemorrhaging to the brain, that that occurred at or near the time of death?

A. Yes.

Decedent also suffered stab wounds that did not appear to be part of the process of dismembering her body or removing her heart. The State's expert testified that from the nature of these wounds, they appeared to be inflicted while Decedent was still alive: "Well, the fact that there was some bleeding around those stab wounds suggests that she was alive at the time they were received, which means that those could have bled." Again, Appellant's expert agreed:

Q. Okay. And that, also, you believe that the stab wounds or the wounds that occurred to the rib area, that that occurred at or near the time of death?

A. Based upon the amount of hemorrhage, yes, sir.

## 5. The evidence supports that Appellant attempted to conceal incriminating evidence.

It cannot be ignored that Appellant attempted to dispose of Decedent by decapitating, dismembering, and burning her body and that he attempted to destroy any evidence showing any means by which she may have been killed, which included the zip-tie. Indeed, Appellant does not challenge his conviction for tampering. The trial court charged the jury to convict Appellant for this offense if he

did, knowing an investigation was in progress, alter or destroy or conceal a human corpse with the intent to impair its verity or availability as evidence in said investigation or any official proceeding, to-wit: by moving the body of [Decedent], and/or removing the zip tie or ligature from the neck or body of [Decedent], and/or cutting off the arms, legs

14

and/or head of [Decedent], and/or cutting out the heart of [Decedent] from the body of [Decedent], and/or burning or attempting to burn the body of [Decedent], then you will find the Defendant guilty of tampering with or fabricating physical evidence as charged in Count Two Paragraph Two of the Indictment.

Therefore, it was reasonable for the jurors to infer that Appellant was attempting to eliminate any trace of Decedent's body that could connect him to her death and that by doing so, he was attempting to conceal her murder. *See Guevara*, 152 S.W.3d at 50 ("Attempts to conceal incriminating evidence . . . [is] probative of wrongful conduct and [is] also [a] circumstance[] of guilt.").

### 6. Appellant's defensive theory

Beginning in the opening statement, Appellant's counsel's theory of the case was that Decedent died during "consensual, risky, kinky sex," which caused Appellant to "wig[] out" and attempt to dispose of Decedent's body.[5] Appellant's counsel questioned various witnesses about "erotica asphyxiation" and, for example, asked the forensic anthropologist whether Decedent "was participating in erotica asphyxiation and that caused her death" and whether "that fit what you saw as an anthropologist?" These questions laid the groundwork for counsel's closing argument in which she suggested that a zip-tie was placed around Decedent's throat as part of a consensual sexual act where "[a] person derives pleasure from depriving the brain of oxygen

---

[5]Indeed, Appellant's trial counsel admitted during her opening statement that Appellant was guilty of tampering with evidence: "Not saying [Appellant] isn't guilty of something, because he tried to dispose of her body, and *what he's guilty of is tampering with evidence*, no intentional or knowing taking of someone's life or causing serious bodily injury to someone." [Emphasis added.]

during sex." But Appellant's counsel did more than simply suggest; she summarized the evidence as follows: "What we do know is, at some point, a zip tie was around [Decedent's] neck. I'm going back, and I'm saying it again. I'm going back, and I'm saying it again. *They had consensual, kinky, risky sex. Erotica asphyxiation.*" [Emphasis added.] Appellant's trial counsel later stated, not as a hypothetical, but in the affirmative that "[Decedent] died during erotica asphyxiation. She died of the zip tie."

The argument continued that Decedent's body went limp and once her "body goes limp and [Appellant] believes that she is deceased, he freaks out." The dismemberment, decapitation, and setting the body on fire was, in Appellant's counsel's depiction, a drunken chaotic reaction to the panic Appellant was experiencing:

> And what do you do at that point if it's you? You should call 911. That's not what he did. What he did was develop in his drunkenness a horrible plan, one in which he will be held accountable for. He developed a horrible plan. Because if the young lady that you just had sex with died and you're not going to call 911, you've got to separate yourself from that young lady. . . . [Y]ou've got to disappear a body.
>
> . . . You can tell from the backyard there appeared to be an attempt to burn her up in his own backyard, but it doesn't burn like paper. Bodies don't disintegrate like paper.
>
> There was no plan of what to do with her body. How do you know that you know that? Because once there's a recognition that her body is not going to burn up very quickly, he's got to bury her.
>
> . . . .

So, now, the shovel plan did not work, as well. . . . And so in his drunkenness, he then had to just take [Decedent's body] somewhere outside of his house.

Going back to this disorganization and no plan is: He didn't have gas to burn this body. So he now, having dismembered this precious human being in a . . . swimming pool, now takes that swimming pool and puts it in the back of his car. . . . And at Grapevine Lake, he puts her body out there, and he douses it with gasoline. He torches it, and he takes off.

**7. The cumulative force of the evidence supports the jury's verdict.**

The record establishes the following facts from which the jury could draw reasonable inferences that Appellant caused Decedent's death and that he did so knowingly or intentionally or that he intended to cause serious bodily injury to Decedent, committed an act that caused such an injury, and that the act caused Decedent's death:

- On the night of Decedent's death she was not only seen with Appellant but was seen leaving a location with him within hours of the time that her body was found;

- Decedent's phone and the TWU bag that she was carrying place either her or her property inside Appellant's house;

- A short time span connects the last time that Appellant was seen with Decedent (10:30 p.m.), the time Decedent's phone was located in the vicinity of Appellant's house (1:30 a.m.), and the early morning discovery of Decedent's body (6:15 a.m.);

- Decedent died as a result of homicidal violence via strangulation;

- The injuries produced by Decedent's strangulation were consistent with her being strangled by use of a zip-tie being used to crush the hyoid bone;

17

- A zip-tie cut in a manner consistent with it being removed from a person's throat was found in a trash can at Appellant's home;

- A DNA profile extracted from the zip-tie found at Appellant's home made it almost statistically impossible that the sample came from someone other than Decedent, and Appellant's counsel conceded the presence of Decedent's DNA on the zip-tie;

- Decedent suffered stab wounds that were inflicted close to the time of death because of the amount of hemorrhaging that occurred;

- Decedent suffered blunt force trauma to the head that was unlikely to be post-mortem because of the amount of hemorrhaging;

- Appellant's counsel acknowledged during closing argument that Appellant dismembered Decedent's body;

- A statistically significant DNA profile of Decedent was found on a knife found in Appellant's house, and the evidence established that the use of such a knife is consistent with the means by which Decedent was decapitated and dismembered;

- Appellant's counsel acknowledged during closing argument that Appellant set Decedent's body on fire; and

- Both dismembering the body and burning it are a means of disposal that are consistent with not only making it impossible to identify Decedent but also destroying evidence of the means by which Decedent was killed.

Thus, Appellant does not dispute his presence at the time Decedent died but attributes her death to an accident that occurred during a sex act. Indeed, evidence places him in the presence of Decedent and her property in the short time frame during which she died, was dismembered, and her body moved to a location where an attempt was made to dispose of it. The means by which Decedent was killed—

18

strangulation—is consistent with an intentional act, an act that a person is reasonably certain to know would cause death, or an act that is intended to cause the victim serious bodily injury. An instrument consistent with the cause Decedent's death was found in Appellant's house and that instrument contained evidence that it had been placed in contact with Decedent's body. Appellant's counsel acknowledged the zip-tie was placed around Decedent's neck, though she claimed Decedent placed it there because only Decedent's DNA was on it. Thus, Appellant was tied to the means of the act that caused Decedent's death. *See Reeves*, 969 S.W.2d at 479 ("When the evidence adduced at trial leaves uncertain the means used or the precise cause of the death of the deceased but creates no doubt that the deceased was killed by the acts of the accused, it is sufficiently proved."); *see also Biffel v. State*, No. 2-01-478-CR, 2003 WL 21476266, at *2 (Tex. App.—Fort Worth June 26, 2003, pet. ref'd) (not designated for publication).

How Appellant treated Decedent's body was consistent with an attempt to prevent the body from being identified and preventing a determination of the manner by which she died, i.e., it was an act calculated to conceal that Decedent had been strangled. Even if the record did not contain Appellant's counsel's admission that Appellant was the one who dismembered and burned her body, the record contains evidence by which the jury could conclude that he was in possession of an instrument by which Decedent's body may have been dismembered and that instrument also contained evidence that it had been in contact with Decedent's body. This evidence

19

independently establishes that Appellant dismembered Decedent's body and then attempted to incinerate the dismembered remains, which are, again, acts a jury could infer were designed to conceal Decedent's identity and how she died. *See Guevara*, 152 S.W.3d at 50 ("Attempts to conceal incriminating evidence . . . [is] probative of wrongful conduct and [is] also [a] circumstance[] of guilt."). Appellant's counsel argued that his efforts were a panicked and inept reaction to Decedent's accidental death, but the jury could reasonably infer that Appellant's acts were instead an inept attempt to conceal the acts by which he caused the death of the Decedent. *Thurston v. State*, 465 S.W.3d 255, 256–57 (Tex. Crim. App. 2015) (Keller, P.J., concurring) ("And although there were no eyewitnesses to the killing to contradict appellant's self-defense claim, his disposal of the body suggests consciousness of guilt.").

Further, the injuries suffered by Decedent are inconsistent with an accidental or self-inflicted injury. The stab wound and head trauma that Decedent suffered according to the medical testimony may have occurred before her death. Both types of wounds show that they were inflicted by violence. Because these injuries carry the inference that they were inflicted through violence, their presence also carries the inference that the other injury that Decedent suffered during the same time frame—strangulation with a zip-tie—was also the result of an act of violence.

A jury may also draw reasonable inferences from a defendant's implausible explanations, and a party is bound by his counsel's concession. *See Guevara*, 152 S.W.3d at 50; *see, e.g.*, *Cuellar v. State*, No. 05-11-01700-CR, 2013 WL 3952043, at *6

20

(Tex. App.—Dallas Aug. 1, 2013, no pet.) (not designated for publication) ("A party may use a formal judicial admission made by a party opponent as a substitute for evidence if the statement is clear, definite, and unambiguous."); *Hitchery v. State*, Nos. 05-04-00032-CR, 05-04-00033-CR, 2005 WL 237230, at \*5 (Tex. App.—Dallas Feb. 2, 2005, no pet.) (not designated for publication) ("A defense counsel's concession at trial can be a binding judicial admission of an appellant's guilt.").

Here, Appellant did not testify about what occurred on the night of Decedent's death, but his counsel built the case around a defense theory that Decedent died as the result of a consensual sex act gone wrong and that Appellant's dismemberment and attempt to incinerate Decedent's body were the result of his panic. This theory provides no explanation for the stab wounds and head trauma. We are reluctant to, and do not, resolve this case on an explanation that may have been created out of whole cloth by his counsel. *Phillips v. State*, No. 14-17-00510-CR, 2018 WL 4087776, at \*5 (Tex. App.—Houston [14th Dist.] Aug. 28, 2018, no pet.) (mem. op., not designated for publication) ("[T]he defense may not use closing argument as a vehicle to place before the jury evidence that is outside the record." (citing *Vasquez v. State*, 484 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2016, no pet.))). But the jury could have reasonably questioned the inconsistency of the theory offered to them by the defense and the nature of the injuries suffered by Decedent. The presence of the head and stab wounds and the time they were inflicted directly undermine Appellant's claim that he had no hand in the injuries Decedent suffered while she was still alive.

Thus, they make implausible and directly undermine the claim that Appellant had no hand in the injuries that Decedent suffered in the same timeframe. Indeed, the claim that Decedent accidentally strangled herself does not account for—and simply expects the jury to ignore—these injuries and how they utterly undermine Appellant's contention that he did no injury to Decedent's body while she was alive.

Therefore, "the cumulative force of all the incriminating circumstances" is sufficient to support the intent and causation requirements for the murder offense for which Appellant was convicted. *Hooper*, 214 S.W.3d at 13. Accordingly, we overrule Appellant's sole point.

### IV. Conclusion

Having overruled Appellant's sole point on appeal, we affirm.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 25, 2019